UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: OCA, Inc., et al.                    CIVIL ACTION

                                            NO: 06-2933

                                            SECTION: R(3)


This document applies to the following civil actions in the
Eastern District of Louisiana: Nos. 06-2874, 06-2933, 06-2938,
06-2940, 06-3226, 06-3227, 06-3228, 06-4303, 06-4307, 06-4309,
06-4310, 06-4312, 06-4313, 06-4315, 06-4317, 06-4321, 06-4323,
06-4327, 06-4329, 06-4330, 06-4331, 06-6268, 07-0474, 07-0479,
07-0480, 07-5614, 07-5615, 07-5616, 07-5617, 07-5618, 07-5619,
07-5620, 07-5621, 07-5622, 07-5623, 07-5624, 07-5625, 07-5626,
07-5627, 07-5628, 07-5629, 07-5630, 07-5631, 07-5632, 07-5633,
07-5634, 07-5635, 07-5636, 07-5637, 07-5638, 07-5639, 07-5640,
07-5641, 07-5642, 07-5643


**ORDER AND REASONS**

    Before the Court are 55 motions to withdraw the reference to

the bankruptcy court filed by doctors in the above-referenced

cases. For the following reasons, the Court GRANTS the doctors'

motions.

## I. BACKGROUND

### A. Factual Background

Orthodontic Centers of America, Inc. (OCA) is a company that provides business services to orthodontists and dentists. OCA is incorporated in Delaware and has its principal place of business in Metairie, Louisiana. It operates through a network of wholly owned subsidiaries named according to the states in which OCA does business (*e.g.*, Orthodontic Centers of Alabama, Inc.). None of its subsidiaries, however, has offices or employees in the individual states in which OCA does business; they are also Delaware corporations with principal places of business in Metairie. Through these subsidiaries, OCA entered into long-term business service agreements (BSAs) with doctors in about 250 practices nationwide to provide office management and patient billing support among other services. Under the BSAs, the doctors pay OCA a monthly service fee based upon a percentage of their operating profit or practice revenue. The BSAs are OCA's primary asset and the source of nearly all its revenue.

On March 14, 2006, OCA and most of its subsidiaries filed Chapter 11 petitions under the Bankruptcy Code. A small number of additional subsidiaries filed Chapter 11 petitions on March 17 and June 2, 2006. All of the debtors' cases have been

consolidated into one case. According to OCA, some doctors began to default under the BSAs in late 2004. The resulting litigation increased dramatically through early 2006 as more doctors defaulted under the BSAs, severely depleting OCA's revenue stream. OCA argues that the doctors did not seek a judicial determination that they were relieved of their obligations under the BSAs, but rather stopped performance under a unilateral determination that OCA was in breach. OCA further claims that the doctors continued to use OCA's intellectual and other property after they stopped performing under the BSAs.

The doctors assert that the disputes between OCA and the doctors did not start in 2004, but began in 1999 with OCA's failure to perform under the BSAs. The doctors were unable to share information they learned in individual contract disputes against OCA because of the requirement that discovery be kept confidential. In 2004, OCA lost a case over its practice of secretly marking up the overhead charged to its clients by ten percent. As a result of this outcome, OCA stopped marking up its overhead, which negatively affected its profitability.

The doctors assert that OCA defaulted under the BSAs by failing to pay practice expenses out of practice revenues in a timely manner. They argue that, since OCA was to use practice

3

revenues, not its own revenue, to pay the expenses, its own
financial troubles should not have affected its ability to
perform under the BSAs. The doctors gave OCA written notice of
default and time to cure. According to the doctors, OCA responded
with silence or letters denying any default. Upon notice of
default, OCA terminated the doctors' staffs and shut off access
to patient scheduling and billing records.

**B.    Procedural Background**

OCA's filing for bankruptcy has given rise to dozens of
adversary proceedings in the bankruptcy court. After OCA filed
for bankruptcy, 11 of the 55 doctors with motions currently
before the Court initiated adversary proceedings against OCA in
the bankruptcy court. Each set of doctors brought state law
claims for breach of contract and breach of fiduciary duty and
sought a declaratory judgment that its BSA is illegal under state
law. Each plaintiff also requested a jury trial. In the remaining
44 cases that are before the Court, OCA initiated adversary
proceedings against the doctors, bringing its own contract
claims, along with claims for unjust enrichment and fraudulent
conveyance. Within these claims, OCA pleaded that it should be
able to offset or recoup any cure amount should the court

4

determine a mutual breach. In response, these doctors filed
counterclaims against OCA, in which they also sought a
declaratory judgment that the BSAs were illegal and
counterclaimed for breach of contract and breach of fiduciary
duty. In their counterclaims for breach of contract and fiduciary
duty, the doctors also pleaded that they should be permitted to
offset and/or recoup any cure amounts from OCA should it be
determined that OCA is entitled to assume the BSAs as part of its
reorganization. Those doctors bringing counterclaims also
demanded jury trials.

On June 5, 2006, a group of 28 doctors moved to withdraw the
reference from the bankruptcy court. On September 18, 2006, the
Court denied these motions to withdraw the reference as
premature. The Court noted that the doctors could renew their
motions to withdraw should it become clear that any of the BSA
disputes required a jury trial.

On January 26, 2007, the bankruptcy court confirmed OCA's
plan of reorganization and entered findings of fact and
conclusions of law that the plan is feasible[1] and in the best

_____

[1] *See* Findings of Fact and Conclusions of Law Regarding the
Confirmation of the Joint Plan of Reorganization at ¶ 17.

interest of the debtors.[2] Specifically, the bankruptcy court found that the plan

> provides for the disposition of all Claims against the Estates, while providing a mechanism for Debtors to resolve [their] pending disputes with Affiliated Practices [doctors]. Thus, the Debtors will emerge from this chapter proceeding with a restructured debt and a business model which puts it on the path to successful reorganization. There will be no need for further reorganization or liquidation and, thus, the Plan is feasible.[3]

Article 5 of the plan provides for the assumption of BSAs. Under the plan, 176 BSAs were assumed unconditionally, and 70, including the 55 BSAs involved in these motions, were assumed conditionally, pending the outcome of the BSA litigation.[4]

With respect to conditional assumption of the BSAs, both the plan and the bankruptcy court's confirmation order incorporate the terms of the August 3, 2006 "Stipulations and Order" entered into between OCA and these doctors.[5] This order provides that

---

[2] *See id.* at ¶¶ 24, 25.

[3] *Id.* at ¶ 17.

[4] *Compare* Confirmation Order Ex. B *to* August 3, 2006 Stipulations and Order Ex. A, B.

[5] *See* Plan of Reorganization at ¶ 5.1.2.1; Order Confirming Plan of Reorganization at ¶ 16; August 3, 2006 Stipulations and Order at ¶¶ 8, 9.

OCA's "conditional assumption"[6] of these BSAs is subject to "the post-confirmation determination of issues related to the assumption/rejection of the BSAs of the Stipulating Parties."[7] The order specifically reserves the following questions for determination after plan confirmation: whether these BSAs are in fact executory contracts that OCA may assume; whether OCA has any obligation to cure under any BSA; whether the BSAs are legally enforceable agreements; the parties' rights of setoff, recoupment, or compensation; whether the BSA litigation is a core bankruptcy proceeding; whether the doctors have jury trial rights; and whether the reference of these cases to the bankruptcy court should be withdrawn.[8] The order further provides that OCA's assumption of other BSAs under the plan shall have no preclusive effect on any issue related to the BSAs of the stipulating doctors.[9] Furthermore, the order explicitly states

---

[6] *See* Stipulations and Order at ¶¶ 1, 2.

[7] *Id.* at ¶ 1.

[8] *See id.* Also, although there is no indication that any of the 55 doctors with motions before the Court have brought suit against OCA in any other forum or brought prepetition lawsuits that were removed to the bankruptcy court, the order also reserves questions about whether any cases should be remanded or removed.

[9] *Id.* at ¶ 6.

that the doctors do not consent to the jurisdiction of the
bankruptcy court over their BSA claims.[10] In addition, the order
provides that in the event of any conflict between it and the
plan of reorganization, the terms of the order shall prevail.[11]
Finally, the plan specifically provides that "all Causes of
Action . . . against any Stipulating Party shall be retained by
and vest in the Reorganized Debtors in accordance with the
Stipulations and Order."[12]

On January 12, 2007, shortly before the bankruptcy court
confirmed OCA's plan of reorganization, some of the doctors
renewed their motions to withdraw the reference. On June 1, 2007,
the Court denied these motions in light of a scheduled mediation.
The mediation was unsuccessful, and 55 of the stipulating doctors
moved to withdraw the reference to the bankruptcy court. Of the
motions to withdraw that are currently before the Court, 25 are
renewed motions, and 30 are new motions. The cases involve
substantially similar claims for breach of contract and breach of
fiduciary duty, along with pleas for setoff and recoupment. In
addition, three doctors filed formal proofs of claim against the

---

[10] *Id.* at ¶ 7.

[11] *Id.* at ¶ 9.

[12] Plan of Reorganization at ¶ 5.1.12.

OCA estate. The bankruptcy record indicates that although one of these doctors later withdrew his proof of claim, he did not do so before the initiation of adversary proceedings.

The doctors argue that the BSA litigation involves questions of state law and does not implicate the Bankruptcy Code in any significant way. Thus, they contend, their adversary actions are not "core" bankruptcy matters that the bankruptcy court may decide. They further argue that they have Seventh Amendment jury trial rights and that they have not consented to trial by the bankruptcy court. Although they recognize that the three doctors who filed formal proofs of claim subjected themselves to the equitable jurisdiction of the bankruptcy court, they argue that the Court should also withdraw the reference in these three cases for reasons of judicial economy and administrative uniformity.

In response, OCA contends that the adjudication of this BSA litigation is a core bankruptcy function because it will determine whether these contracts are executory and therefore are capable of being assumed. OCA further argues that all of the doctors, by initiating adversary proceedings and filing counterclaims for setoff and recoupment, effectively filed claims against the estate, thereby consenting to the bankruptcy court's jurisdiction and waiving any jury trial rights they might have

had. OCA also maintains that the Court should deny as untimely
any new motions to withdraw the reference.


**II. DISCUSSION**

     The standard for when a district court may withdraw the
reference from a bankruptcy court is outlined in 28 U.S.C. §
157(d), which provides for both mandatory and permissive
withdrawal:

> The district court may withdraw, in whole or in part,
> any case or proceeding referred under this section,
> on its own motion or on timely motion of any party,
> for cause shown. The district court shall, on timely
> motion of any party, so withdraw a proceeding if the
> court determines that resolution of the proceeding
> requires consideration of both title 11 and other
> laws of the United States regulating organizations or
> activities affecting interstate commerce.

28 U.S.C. § 157(d). The doctors do not seek mandatory withdrawal
of the reference, and no party contends that the BSA disputes
implicate federal law. Nor does the Court discern any federal
questions in these adversary proceedings. Consequently, the Court
will consider whether permissive withdrawal is appropriate under
28 U.S.C. § 157(d) "for cause shown."

     The Fifth Circuit has held that in determining whether to
withdraw the reference for cause shown, district courts should
consider whether the matter at issue is a core or a non-core

proceeding. *See Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985). Additionally, courts should consider whether the proceedings involve a jury demand and whether withdrawal would further the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtor's and creditors' resources, and expediting the bankruptcy process. *Id*.

### A.   Nature of the Proceedings

A non-exhaustive list of core proceedings is set forth in 28 U.S.C. § 157(b)(2). The list includes allowance or disallowance of claims against the estate, estimation of claims, and counterclaims by the estate against persons filing claims against the estate. *See* 28 U.S.C. §157(b)(2)(B), (C). Other than by listing examples, the statute does not define "core proceedings." The landmark Supreme Court case of *Northern Pipeline v. Marathon Oil*, 458 U.S. 50 (1982), set out the general principle that "the restructuring of debtor-creditor relations [ ] is at the *core* of the federal bankruptcy power, [and] must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages." *Id.* at 71 (Brennan, J., plurality opinion) (emphasis in original). Courts consider

11

matters that arise under the Bankruptcy Code to be core. *See In re Babcock & Wilcox Co.*, 2001 WL 1018366, at *3 (E.D. La. July 2, 2001). Additionally, courts consider a proceeding core if it involves substantive rights provided by title 11 or if by its nature the proceeding could arise only in the context of a bankruptcy case. *See Wood*, 925 U.S. at 97.

As the Court explained in its September 18, 2006 order denying the initial motions to withdraw the reference, *Wood* is instructive on what constitutes a core proceeding. In *Wood*, the court considered whether a single state contract claim could constitute a core proceeding, and explained that bankruptcy judges

> may exercise full judicial power over only those
> controversies that implicate the peculiar rights and
> powers of bankruptcy or . . . controversies at the
> core of the federal bankruptcy power. [But]
> controversies that do not depend on the bankruptcy
> laws for their existence – suits that could proceed
> in another court even in the absence of bankruptcy –
> are not core proceedings.

*Id.* at 96 (internal quotations omitted). In holding that the contract dispute did not constitute a core matter, the *Wood* court reasoned that any connection between an ordinary state contract claim and the bankruptcy proceedings was speculative because the essential issue was liability under state law, the determination

of which might or might not raise core bankruptcy matters. *Id.* at 98. Such a connection would arise only after the issuance of a judgment and the initiation of proceedings to allow that claim or discharge that debt. *Id*. That the doctors' claims are for breach of contract, breach of fiduciary duty and declaratory relief, and are entirely based on state law, supports a finding that they are noncore claims.

Further, as a result of the bankruptcy court's confirmation of the plan of reorganization, the current posture of these cases is dramatically different from what it was a year ago. By confirming the plan, the bankruptcy court has already restructured OCA's relations with its creditors. Resolution of the BSA litigation at issue in these motions is not integral to this restructuring and reorganization. The confirmed plan of reorganization was based on OCA's unconditional assumption of 170 BSAs. It assumed the 55 BSAs at issue on only a conditional basis, subject to later determination of the issues raised in the adversary proceedings. The plan provides no assurance that the reorganized firm will in fact ultimately assume these contracts. Thus, the bankruptcy court's determination on plan feasibility and the exercise of business judgment took into account the conditional nature of the assumption of these BSAs. There is

13

nothing in the plan or the bankruptcy court's confirmation order to suggest that confirmation was contingent on a finding that these disputed BSAs are indeed executory contracts capable of being assumed. Nor does the plan indicate that it is necessary for the bankruptcy court to resolve these issues in the debtors' favor for the reorganization to become effective. On the contrary, the plan's explicit incorporation of the bankruptcy court's August 3, 2006 Stipulations and Order, which reserves all issues in these cases, indicates that OCA's reorganization does not depend on its assumption of any of the BSAs at issue in the motions to withdraw. That resolution of these issues will affect the reorganized firms is not in dispute. Any litigation involving OCA and its subsidiaries will impact the companies. Whether these issues are integral to reorganization is a different question. By the confirmed plan's very terms, resolution of these BSA disputes is not vital to the debtors' restructuring and is therefore adventitious to the reorganization. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60 n.15 (1989).

The bankruptcy court has apparently made the bankruptcy law determination that it is in the best interests of the debtors to assume these contracts, subject to the outcome of the BSA litigation. What is left in the BSA litigation are really state

14

law issues of the legality of the contracts and whether they were breached under state law. These issues do not implicate bankruptcy law or special bankruptcy court expertise. There is nothing about the bankruptcy, the construction of the plan or its implementation that compels the bankruptcy court to decide these state law claims. In *Wood*, the Fifth Circuit cautioned against treating any proceeding that affects the estate as core because "otherwise, the entire range of proceedings under bankruptcy jurisdiction would fall within the scope of core proceedings, a result contrary to the purpose of the 1984 Act. That purpose is to conform the bankruptcy statute to the dictates of *Marathon*." *Wood*, 825, F.2d at 95.

The BSA disputes at issue involve questions of state law. Under the confirmed plan, OCA assumed these BSAs on only a conditional basis, subject to the outcome of later litigation. Resolution of these issues is not integral to the restructuring of debtor-creditor relations, as the bankruptcy court has confirmed the plan of reorganization. Accordingly, these disputes, although initiated in the bankruptcy courts, are not core proceedings under title 11.

**B.   Jury Trial Demand**

In every adversary proceeding at issue, the doctors have demanded jury trials. Furthermore, the August 3, 2006 Stipulations and Order expressly provides that the doctors reserve their right to a jury trial and that they do not consent to trial of the adversary actions by the bankruptcy court. Still, OCA contends that the doctors, either by initiating adversary proceedings or filing counterclaims against OCA, have consented to the equitable jurisdiction of the bankruptcy court, thereby waiving any Seventh Amendment jury trial rights.

A threshold question for the Court to consider is whether the nature of the doctors' claims entitles them to jury trials. The Court finds that the doctors' claims would entitle them to jury trials. Each doctor's breach of contract claim requires the interpretation of the BSA and whether OCA breached the agreement. Breach of contract claims are legal actions that entitle the parties to a trial by jury. *See Simler v. O'Connor*, 372 U.S. 221, 223 (1963) (holding that a suit to enforce contract rights was a legal action even though it was brought as a declaratory judgment action); *In re Tastee Donuts, Inc.*, 137 B.R. 204, 206 (E.D. La. 1992). The doctors also invoke the equitable power of the Court in their request for a declaratory judgment that the BSAs are

16

invalid under state laws. But the Supreme Court has held that if a "legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact." *Curtis v. Loether*, 415 U.S. 189, 196 n.11 (1974); *see also Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 510-11 (1959). Accordingly, the doctors do not lose their rights to jury trials even if one of their claims is equitable in nature.

There are bankruptcy court decisions that support both the debtors' and the doctors' arguments on whether the doctors waived a jury trial by filing a claim or counterclaim as part of an adversary proceeding. These cases are not binding authority on this Court, and the Court has not found any Fifth Circuit authority on point. Further, the Court does not find the waiver cases that OCA cites to be persuasive in this context. These cases appear to have been decided in the middle of bankruptcy proceedings, not after reorganization had occurred. There is no indication in any of these cases that they were decided after the bankruptcy court had approved a plan of reorganization. *See, e.g., In re Commercial Fin. Servs., Inc.*, 252 B.R. 516, 525 (Bankr. N.D. Okla. 2000) (*Commercial Financial Services II*) (explaining that plaintiff's claims entailed a request for the

court "to determine that their claims have administrative priority over other claims against the estate"); *In re Commercial Fin. Servs., Inc.*, 251 B.R. 397, 406, 408 (Bankr. N.D. Okla. 2000) (*Commercial Financial Services I*) (stating that defendant's claims "would reduce the recovery [debtor] would obtain for distribution to unsecured creditors" making it "integral to the restructuring of the debtor-creditor relationship"); *In re N. Am. Energy Conservation, Inc.*, 2000 WL 1514614, at *2 (S.D.N.Y. Oct. 12, 2000) (observing that a claim for setoff "takes on a particular importance in the context of bankruptcy, as it, in effect, elevates an unsecured claim to secured status to the extent that the debtor has a mutual pre-petition claim" (internal citations omitted)); *In re Lang*, 166 B.R. 964, 966 (D. Utah 1994) (explaining that nondebtor brought adversary proceeding on issue of dischargeability, a determination that is integral to restructured debtor-creditor relations). The Court has no doubt that what animates many of these decisions is the recognition that the exercise of bankruptcy jurisdiction over claims such as these will facilitate the bankruptcy court's ability to manage the process of reorganization and the restructuring of debtor-creditor relations. That consideration, however, is not present here because the bankruptcy court has already accomplished the

task of reorganization and confirmed the plan. Moreover, from the beginning, the doctors have asserted their jury trial rights. They have never manifested an intention to waive them. On the contrary, by entering into the bankruptcy court's August 3, 2006 order, they underscored that they do not consent to the jurisdiction of the bankruptcy court and still demand jury trials. The debtor developed a plan for reorganization that provides for only the conditional assumption of some BSAs. The dispute over these BSAs is now between the doctors and the reorganized firm. The BSA disputes at issue in this litigation do not arise in the same context as the nondebtor claims and counterclaims in the cases that OCA cites, and their resolution is not integral to the reorganization process. Accordingly, the Court concludes that the doctors did not waive their jury trial rights by initiating adversary proceedings and filing counterclaims.

The Court also recognizes that three of the doctors who have moved to withdraw the reference also filed formal proofs of claim. Typically, parties who file proofs of claim are treated as having consented to the jurisdiction of the bankruptcy court. *See Langenkamp v. Culp*, 498 U.S. 42, 44 (1990) (explaining that by filing a proof of claim a party "triggers the process of

'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power"); *Wood*, 825 F.2d at 97 (observing that a party who filed a proof of claim "invokes the special rules of bankruptcy"); *In re Efficient Solutions, Inc.*, 2000 WL 1876356, at *5 (E.D. La. Dec. 20, 2000) (same). But in the current context, the Court fails to see how these doctors are in a different position from the other doctors who did not file proofs of claims against the estate. The August 3, 2006 Stipulations and Order that sets out the framework for the reorganized firm's conditional assumption of BSAs applies to these doctors in the same way as it does to all of the others. Similarly, these three doctors took the same steps to assert their jury trial rights as did all of the others. The plan does not treat them any differently than the other doctors seeking withdrawal. Additionally, as explained, *supra*, the plan provides a mechanism for resolution of claims against the estate that would apply to these three doctors' claims. At this juncture, that these doctors filed proofs of claim is not determinative of whether they waived their jury trial rights. For all practical purposes, they are in the same boat as the other doctors because the bankruptcy court has confirmed the plan, and the plan treats them the same as the other doctors who object to the assumption

20

of their BSAs. Accordingly, the Court finds that these three
doctors have not waived their jury trial rights. Additionally,
the Court notes that their claims present the same noncore issues
as the other doctors, and that the plan is not contingent on any
particular resolution of these issues.

### C.   Other Factors

Although the Court concludes that these proceedings are non-
core and that the doctors retain the right to jury trials, it
will briefly address the other *Holland America* factors and the
issue of timeliness. Considerations of judicial economy in this
context are neutral. The bankruptcy court has expeditiously
handled discovery and pretrial issues, and these cases are
apparently ready for trial. At this juncture, a trial must occur
in one court or another. The bankruptcy court is not empowered to
conduct a jury trial in any event. The Court find that judicial
economy does not weigh for or against withdrawal.

The Court finds that withdrawing the reference does not
interfere with the uniformity of the bankruptcy administration.
The plan of reorganization is not contingent on the resolution of
these suits. The bankruptcy court may act on the outcomes
rendered in the litigation in the process of administering the

plan. In addition, the Court does not find any evidence of forum shopping. The doctors asserted their jury trial rights upon filing their claims and counterclaims. And in the Stipulations and Order, they expressly reserved these rights and made clear that they did not consent to the bankruptcy court's jurisdiction.

Finally, the Court finds that the doctors' motions do not raise any timeliness concerns. In its September 18, 2006 order, the Court made clear that motions to withdraw the reference could be filed when it became clear that jury trials would be required. The Court denied the second round of motions in favor of allowing the scheduled mediation to proceed. Once that failed, and it became clear that the cases would proceed to trial, the motions to withdraw then became ripe. That some of the doctors did not join in the initial round of motions is of no consequence. All of the doctors before the Court were covered by the bankruptcy court's August 3, 2006 Stipulations and Order, which clearly reserves the issue of whether jury trials are required and whether withdrawal of the reference is appropriate. Therefore, the Court finds that these doctors timely filed their motions in light of the case management decisions by this Court and the bankruptcy court.

**III. CONCLUSION**

For the foregoing reasons, the Court GRANTS the doctors' motions to withdraw the reference.

New Orleans, Louisiana, this <u>5th</u> day of November 2007.

_Sarah Vance_
_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE